Good morning, Presiding Judge Fletcher. May it please the Court, I'm Dillon Karp. I represent the Plaintiff Appellant, Aeroturbine, Inc. This appeal presents the issue whether this is one of the extremely rare cases where it would be appropriate to dismiss a trademark infringement lawsuit on summary judgment solely on the ground of latches. The District Court did not cite one case in which summary judgment was granted on latches, or if summary judgment was granted on latches below, everyone was reversed on appeal. So it's almost impossible to get summary judgment on latches on a trademark infringement claim. And I would like to highlight for the Court just a few of the most important disputes of material fact that the District Court inappropriately resolved below, and therefore why this case needs to be reversed and remanded for trial. The second prong of the six-prong latches test is called diligence of the plaintiff in enforcing his mark. In other words, did the plaintiff delay? And if so, was the delay reasonable? May I just ask a preliminary question? Please. Now, you brought your trademark infringement claim under California law, did you not? Not Federal law? No, both, Your Honor. On both Federal and State? Yes. My question was going to be this. Does California law use the six-factor test articulated by the Ninth Circuit in these systems, or is the California law different? My understanding is the six-factor test applies to both. Right. The California law applies to both Federal law and State law. I had an impression that the latches test was a more general test under California law, but I may well be mistaken. Thank you. I can see that. I didn't come prepared to address that point, so I could be mistaken. All right. Please proceed. I wanted to so I'd like to point out for the Court at least one important material fact that's in dispute with the District Court inappropriately resolved, and that's the second-pronged diligence of the plaintiff in enforcing the mark. The defendant's evidence on this point, well, let me state the summary judgment standard, which is that the defendant has the burden of persuasion that there's no dispute of fact on this point. So we'll look first at the defendant's evidence. Well, I think we can do this quite simply. Whatever you have evidence that says is true, we take as true. Okay. Not what you say is true, but whatever you have evidence is true, that's true. I agree with that. Okay. So we'll look at the defendant's evidence as to how the defendant's evidence regarding our diligence in enforcing our mark. The defendant said that it advertised at industry publications. It submitted one undated advertisement from a publication called World Aviation Directory. It submitted one advertisement from a publication called Speed News. That is dated. That's from 1997. That Speed News ad is literally about five millimeters in height. That's at page 115 of the record. The defendant also testified that it attended trade conferences and that it released a press release in 1997. That's the defendant's evidence. This is the plaintiff's evidence. The plaintiff's president testified that he regularly surveyed industry publications. He regularly reviewed the World Aviation Directory, a well-known publication called the Thomas Register. He reviewed a government-published list of vendors, and he regularly reviewed Federal Aviation Administration repair station lists. The plaintiff testified that having regularly reviewed all of those publications, the plaintiff did not discover the defendant until March of 2000. And the discovery really took the form of someone calling him from Bethlehem. That's correct, Your Honor. He never discovered it independently. That's correct, Your Honor. When you say he testified, was that in a deposition or in a declaration? In a declaration. So this was after the summary judgment motion had been brought, that he put in this declaration. That's correct, Your Honor. And this was after he had given the interrogatory answer, which said, what did you do to police and so forth, and he said nothing. That's correct, Your Honor. So doesn't this fall under the sham exception where you can't, once you're hoisted on your own petard of your own interrogatory answer under oath, and now you see that it's going to hurt you on summary judgment, the law in the Ninth Circuit says you can't come in with a sham declaration and try to get out of it. That happens all the time in the district court. And routinely the district judges say, no, you can't have it both ways. You testify to X, you're stuck with X, unless you can show that somehow there was a good faith basis for believing you were confused. That's correct, Your Honor. Why did you say testify as opposed to put in a declaration? It made it sound like he had said that in discovery. That's not the case. He said it in a declaration on summary judgment. Perhaps I should have used the word testimony. I didn't mean to imply that. But it was under oath. It was a declaration. Of course it was under oath. Yes. All right. Go ahead. The sham declaration rule has a well-established exception for a believable explanation as to a mistake or misunderstanding of a previous discovery question or response. How could that interrogatory have been possibly misunderstood? As the declaration says, the interrogatory said, tell us about all efforts that you've taken to police your mark. I think it said including but not limited to legal actions, other types of actions. And plaintiff's president interpreted that as legal-oriented. Meaning lawsuits. That's correct. But on its basis it says not limited to lawsuits. So his answer, his explanation for why he said none, is now directly contradicted by the clear language of the interrogatory. Well, we'd be prepared to take our love in front of a jury on that case. But the sham declaration rule requires no reasonable explanation. Well, that's the way it's been under that view. You would never have summary judgment granted at all. It would always go to a jury. The whole point of the sham rule is that you can't get out from under summary judgment by putting in sham declarations. That just contradicts something. You know, life is so short litigation goes on. Clear questions are asked. Clear answers are given. Summary judgment is made. And then at that point they want to get out of it and say, oh, so wait a minute. Well, we have no quarrel with the sham declaration rule. If we had no explanation as to why it was misinterpreted, it should apply. All right. Thank you. Maybe I should leave it alone. But let me ask.  If you have a question, then you should be able to supplement or get out from under by later declaration. Your explanation is? The explanation is the declarant, the plaintiff's president, interpreted it as being limited to lawsuits or related actions, not including reviewing industry publications to look for potential infringers. That's not the only. Can I ask one other question? At the time he gave that answer, were you his lawyer? Yes, we had been retained as an attorney. Did you read that interrogatory and review his answer before it was submitted to the court? I did. Have you put in a declaration as to how you construed it? I did not. All right. But that's ñ if you disagree with me that that is no longer a dispute of fact, there are numerous other material disputes of fact of the district court inappropriately resolved below. I'd ask the Court to look at the first prong of the Latches test, which is the strength of the marks, and in particular, the strength of plaintiff's mark. Again, defendant has the burden of persuasion. That there's no genuine dispute of material fact on this prong, which means the defendant has to show, has to persuade this court, that every juror must find that plaintiff's mark is descriptive rather than suggestive. The substantive standard is a descriptive mark describes the good or service. A suggestive mark requires imagination or a mental leap to connect the trademark to the good or service offered. Now, let me ask a question. If we find or conclude that curio blank turbine is descriptive, is there any evidence in the record of secondary meaning? We did not introduce any, no, Your Honor. All right. Did you have the opportunity? Yes. All right. So we look at the defendant's evidence as to how we cannot possibly convince a jury that error turbine is suggestive, requires imagination or a mental leap to connect error turbine, Inc., to plaintiff's goods or service. So what evidence did the defendant introduce? The defendant essentially introduced one page, one letter that plaintiff sent to a customer in around the year 2000 saying plaintiff is, quote, in the aircraft turbine engine and accessory overhaul business. Okay. That's defendant's evidence. What's plaintiff's evidence? Plaintiff has an authenticated brochure in the record, and particularly page 205 of the record of that brochure lists a number of services. The vast majority of the services on that page have no direct relation to turbine engines. The vast majority of those services relate to either aircraft, components of aircraft, or parts of engines. There's almost no direct work on turbine engines on that brochure. That's one piece of evidence. Okay. What page is that on? 205 of the record. I just want to make sure I absorb that point. Say that last sentence again about page 205. The vast majority of the services listed on page 205 do not pertain to direct work on turbine engines. The vast majority pertain to work on aircraft components other than engines or the parts of engines. Do we have anything on the record that tells us what proportion of your actual work, not what's sort of stated here in the brochure, but what proportion of your actual work is work on turbine engines? There really isn't anything in terms of percentage. There's just a number of statements saying we do work on aircraft, we do work on engines, we do work on parts, component parts of aircraft other than engines, and we do work on engine parts. I'm reading from the very first page of this brochure. Well, I guess text page 202. And it describes at the top our facility, our new 41,000 square foot facility, the airport. And then the sentence that describes what you do begins, AeroTurbine's main facility contains a complete turbine engine overhaul shop, accessory overhaul shop, and machine shop. What you're presenting yourself to the public as doing, the first thing you mention is an overhaul. Turbine engine overhaul. That's right, Your Honor. I mean, that's part of our point is we have a right to aircraft. We do work on. And we submit that defendant with essentially one piece of evidence, the defendant has not discharged its burden of persuasion that plaintiff has no evidence that it could use to convince a jury that it requires imagination or mental leap to connect AeroTurbine, Inc. with all of the goods and services that plaintiff provides. We submit that maybe this court might ask what would a descriptive mark be? Maybe aircraft turbine engine overhaul, aircraft and parts repair. That would describe our business. AeroTurbine does not. Okay. Let me ask you a question. You argue that the two companies compete because you have plans for expansion. And is there any case law that suggests that a party's expansion plans can be used to demonstrate actual competition? I believe the AMF v. Sleepcraft case holds that. It holds that at least relevant to the likelihood of consumer confusion analysis, definite expansion plans by the plaintiff is highly relevant to that analysis. And, indeed, in the American International case, one of the reasons the summary judgment on last year's grounds was reversed by this court was that the plaintiff had introduced evidence of expansion plans into an area that more closely overlapped with the defendant. One of the extraordinary things about this case is the district court completely ignored our testimony about expansion plans. We testified. We didn't just stick this in the brief as a rhetorical point. We have a declaration under oath saying we are in negotiations with a company to provide, to manufacture, repair, and overhaul parts for CFM-56 engines. The importance of that is they could be used on not only military aircraft but also commercial aircraft, including Boeing 737s. That's in our declaration. The defendant said that that testimony is irrelevant because the plaintiff works on military aircraft, not commercial aircraft. The defendant works on commercial aircraft such as Boeing 737s. Can you point to me, if you can quickly, where the declaration is that states not the identification number of that engine but also says that that engine has a civilian application? Yes. I believe it's in the Statement of Undisputed Facts, which is the record of 288, paragraphs 90 to 91. Okay. And I'd like to see the underlying proposition, not just the reference to it. I'll get that page for you. Just a moment, Your Honor. Okay. Sure, sure. In the record of where? In the Statement of Undisputed Facts, it's at page 288, paragraphs 90 and 91. And the direct reference is page 189, paragraph 11. 189, paragraph 11. Well, this is equivocal, at least as I read it, the paragraph 11. Plaintiff is negotiating with Honeywell to manufacture engine component parts for CFM-56 engines and repair and overhaul. CFM-56 engines are used on both commercial and military aircraft, but there are a lot of sub-numbers that separate out which CFM-56, and there will be dashes followed by other numbers, and some of those are going to be commercial and some of those are going to be military. Isn't that right? That's right. That's why the president specifically mentioned 737 on line 12. Well, but I have to say it's a little equivocal to me. It's negotiating component parts for CFM-56 engines. It doesn't say what kind of 56 engines, and then it says generally that CFX engines are used on commercial and military aircraft. And I may be parsing this too carefully. I confess that. But it doesn't say we are negotiating to manufacture engine component parts for CFM-56 engines that will be used for commercial applications. It does not quite say that. Is that right? That's right. If this, you know, perhaps if this were a jury in a jury room, that might be irrelevant in consideration, but on summary judgment. I may be pushing too hard on the language. Okay. And, Your Honor, I forgot to reserve time. I wonder if I could just reserve the balance I have. Oh, please do. For rebuttal. Thank you very much. Good morning. May it please the Court, I am Boyd on behalf of Defendant Appellee. The plaintiff is here today asking this Court to remand this case so that it continue its somewhat plodding prosecution of its trademark infringement claims. But the plaintiff does not have the right to bring such a claim because, as we know, it does not have a protectable trademark. The plaintiff told us it does not have a federal trademark registration. It told us it deemed the $175 filing fee to be too expensive. Therefore, it is plaintiff's burden to establish that it has a protectable trademark and it is plaintiff's burden to establish the industry sectors and geographic regions where it has such rights. There are two ways the plaintiff can do this. One is it can establish that its mark is suggestive. The other way is it can establish that it has a descriptive mark with secondary meaning. We can dispense with the second argument right now. The plaintiff just admitted that it did not present any evidence of secondary meaning onto the record. Therefore, the plaintiff has painted itself into a bit of a corner. This case can only proceed if its mark is found to be at least suggestive. Well, as this Court noted last year in Interstellar v. Epix, a mark is only suggestive if it requires imagination or thought or perception to associate the plaintiff's goods and services with its mark. This Court in Interstellar cited a very good example of a suggestive mark, Roach Motel. The product is not literally a lodging for traveling roaches. It's a place where, as we know, roaches check in, they don't check out. It's an insect trap. What's a descriptive mark? A mark is descriptive if it describes a primary characteristic or a function of an article or service. That the mark may not describe every specific good or service will not cause the mark to be suggestive. By way of example, if someone were to open up a restaurant and call it Burger Place to sell hamburgers, but say, look, we also sell French fries, we also sell a line of healthy salads, we have clam chowder on Thursday, and there's a video arcade in the back where kids can play video games while they wait for their food. Therefore, because we offer these additional goods and services that have nothing to do with hamburgers, our mark should be suggestive. That's not the way that it works. And that's what the Federal Circuit held in Dial a Mattress. Now, does the plaintiff's mark here require imagination or thought or perception to associate its mark with its goods or services? Absolutely not. And there are two ways to look at what the plaintiff has told us. There's what the plaintiff has told us in this litigation, and there's what the plaintiff has told its customers. Well, in this litigation, in fact, in Paragraph 9 of its own complaint, found in Excerpt of Record 003, the plaintiff states that it primarily overhauls aircraft engines, i.e., turbine engines, and components thereto, components for turbine engines, and sells surplus parts for aircraft engines. As Mr. Karp noted, plaintiff has informed its customers previously that it's in the aircraft turbine engine and accessory overhaul business, overhauling accessories for turbine engines. And as this Court noted, the plaintiff's own brochure is telling. This is a document that was completed in 2001. To the best of our knowledge, it's the only piece of print advertising the plaintiff has put together in the last eight years, and it states, at Excerpt of Record 202, as Judge Fletcher just noted, AeroTurbine's main facility complains a complete turbine engine overhaul shop. Turn the page in that brochure. AeroTurbine provides specialized services for a large variety of turbine engines and accessories. And finally, I refer the Court to the last page of that brochure, which contains plaintiff's mission statement. This is what plaintiff is all about, to provide the highest quality of standard of turbine engine and accessory services available for our U.S. and international customers. I also would like to very briefly refer to some testimony which we cited in our brief and which was the subject of the Court's request for a letter brief. And this has to do with Mr. Clayton's testimony and the genesis or the basis for naming the company AeroTurbine. And I'll just paraphrase Mr. Clayton's testimony here. He stated the term turbine was important because that's what we wanted to focus on, turbine engine parts and components. That was really the critical element. The fact that we had air in there, just to signify it was aircraft-related. It's true that Mr. Clayton's response was specifically addressing the predecessor to AeroTurbine, named California Air Turbine, but I think it's important to note how we got there when we got there at his deposition. Question. What's your understanding as to why the mark AeroTurbine was chosen for the company? Answer. We just go through how it originated? Question. Yes, please. Answer. It dates back to 1972 when my brother and I formed a partnership that we called California AeroTurbine, and this testimony is at further excerpt of Record 01. Mr. Clayton then testified that this company was short-lived due to the untimely death of his father, and when they decided to restart the company, the question posed to his brother was, did we want to call it California AeroTurbine again? So although this testimony was not directly reflecting the selection of the mark AeroTurbine, we do think it is relevant as to why the plaintiff chose this name. Now, in light of this evidence, it was the plaintiff's obligation to come forward and establish a genuine issue of material fact as to why it has a protectable mark. It is true that on latches it is the defendant that bears the burden of proof. Let me ask you about latches, and my experience with a number of cases leads me to believe that California law on latches is far more general than the e-factors formula. But the Gerald Fomitas case was cited, and it says that if the length of delay is less than the three-year statute of limitations for fraud, we apply a presumption against latches. Here it was a two-year delay. Is that right? Why would latches apply? That rule of law is correct. We would disagree with the amount of time. I believe, as Gerald also states, the standard to apply there is a new or should-have-known standard. And we would definitely submit that the plaintiff should have known of the defendant much earlier than it did. How long? Well, Mr. Karp talked about the evidence that we had in the record of the defendant's use of its mark. And admittedly, there is not much in the record, but this has never been contested. And I would refer the Court to Undisputed Fact 25, which states that the, let's see, beginning upon opening the stores for business in November 1997, defendant immediately issued press releases, advertised extensively in industry publications, and filed a Federal trademark application for AeroTurbine. That's not disputed. All right. Whatever the fact, how many years are we talking about? The defendant began servicing as to when the plaintiff should have discovered the defendant. We think, given the extensive amount of resources that the defendant started spending from day one, that the plaintiff should have discovered the defendant within six months, by the spring of 1998. Now, that takes us right at that three-year window of time with respect to whether the presumption falls for the plaintiff or for the defendant. The suit was not brought until April of 2001. Can you refer to me any Ninth Circuit case that has applied lasses to borrow a suit for at least three years or less? No, I cannot. I also cannot refer the Court to any latches case where the defendant had sales of over $160 million by the time the suit was brought, and yet it was still found that latches was not appropriate. You know, as this Court noted in Beattie v. Sealinger, there are two principal concerns with latches. There is delay and there is prejudice. The amount of delay is not as a primary concern. It's more the prejudice that tends to be the focus of the Court's attention, while the delay is important. And here we believe that the prejudice is extreme to the defendant, especially given the extensive nature of its investments, of its sales, of its goodwill during that time. I want to talk about that in that three-year period. You did receive notice. You did receive a cease and desist notice. Absolutely. And then there was a period of about six months that went by. I've forgotten how many months. Ten months. Ten months went by. Now, if you start from spring of 1998 and say that the first six months, that would have been an investigation, then they should have found out in the spring of 1998. When was the cease and desist notice? The cease and desist letter, the plaintiff alleges it discovered the defendant in May of 2000. All right. So that would be two years, a two-year period. Correct. And then you want to tack on to that an additional ten-month period. We believe that's appropriate because of what happened. Immediately upon receipt of the cease and desist letter, the defendant's principal immediately telephoned Mr. Clayton, asked him what he did. Mr. Clayton said, we primarily deal with military aircraft. The defendant said, we only deal with large commercial air transport category aircraft. There's no problem here. Why don't we exchange customer lists? I have no doubt we'll resolve any concerns that you have. Mr. Clayton said, hmm, let me talk about it with my lawyers. Maybe that's something we can do. He didn't say that he had dropped his demand, but at the same time, he didn't restate his conviction that he believed the defendant was infringing his right. But you have to admit, don't you, that at that point, your side of defense knew you were on notice that the cease and desist letter had come, and so weren't you acting at your peril from that point forward in continuing to invest money in this trademark? We don't believe that we were. We would agree that we were on notice when the cease and desist letter came, but because of our attempts to try to resolve the matter, the cease and desist letter said you have seven days to shape up. We thought it was resolved. We heard nothing subsequently. And we believe it simply cannot be the case that every time someone receives a We believe that we took the appropriate steps to try to resolve the matter. It's true we didn't have a signed release from Mr. Clayton. Did you ever send a letter saying we haven't heard from you in several months? We assume the matter is dead. No. We assume that, but we did not send a letter to that effect. And you would agree, wouldn't you, that after you had that conversation, even assuming you could reasonably rely, there would have to be a decent interval of time before you could begin to take comfort in the fact that you had heard nothing back? I would agree there would need to be a decent interval of time. And I think the standard as to what that decent interval is would depend in large part upon the investment that the defendant was making in its mark and that the plaintiff was aware that the defendant was making in its mark. The thing that bothers me about this case is that you that's a classic fact issue about reasonableness, reliance, and so forth. But on the other hand, that's only one of the six factors. But the way the district judge approached this was to assume from day one there was delay and assume from day one not even to credit the six-month period that you're willing to credit. Isn't that true? I don't know specifically the time that the district court decided to give credit to the defendant. I think the district court was focusing its attention more on the fact that it believed that the plaintiff should have discovered the defendant much sooner than it did, especially in light of the plaintiff's interrogatory response where it stated it was not policing or diligently enforcing its mark. Well, that's true. All that's true. But if we look at it from the point of view of, all right, in order for the plaintiff to have been reasonable, when should they in the exercise of due diligence have discovered your client's activities? And you say six months. All right, so let's take that then as a given. Then we have to measure the amount of the harm from that six-month point forward, maybe subtracting out the period of time you had these discussions in a decent interval for reliance to set in again. But none of that was done by the district court. The district court just said everything, didn't make any of those distinctions on that one factor. That troubles me about the way this was weighed on these six factors. Okay. Well, I have no desire to cause the court further trouble. One of the things that this court is here for, put bluntly, is should this court find that the plaintiff's mark is at least suggestive? And we submit that the only thing the plaintiff submitted was a declaration, what we would call a self-serving declaration, attesting to the fact that this mark is descriptive. And we believe under self-realization and Filipino Yellow Pages that doesn't do it. But if this court engages in the latches analysis, if it finds the plaintiff's mark is at least suggestive, the standard of review, as this court clarified in Beattie v. Selinger, is that it is denoble with respect to the disputed facts, but abuse of discretion with respect to the latches doctrine itself. Now, the district court found that all six of these factors favored the defendant. This court may find that all six favor the defendant. It may find that all six favor the plaintiff. But if it finds that a significant number of these factors do favor the defendant, this court does not need to come down on every single factor in alignment with the district court. It is sufficient if it believes that there was no, I believe the standard is a clear and convincing error on the record before it. Excuse me. I didn't mean to interrupt you. Assuming that we get by the fact that it might have been a jury question as to whether the delay was reasonable, what disturbed me also about this case was that the district court judge found prejudice. Isn't this a jury question? I don't think so. No, I think when you look at the prejudice to the junior user here is one of the six factors under the E-Systems test. The fourth factor, the plaintiff concedes, and I think it's an important concession, that the defendant proceeded in good faith when it selected its name. We then look to the prejudice that the defendant incurred as a result of the plaintiff's delay, and there may be some disagreement as to when we start that clock. This court has previously held that mere delay can create a rebuttable presumption of prejudice. We think we have much more than that here. By the time suit was filed, the plaintiff had expended over $2 million in promotional and advertising expenditures, received over $160 million in revenue, and I think a very important point here that both prior district and I believe Ninth Circuit courts have recognized, this mark is plaintiff's entire business and its goodwill. This is not one product that sells under a house mark or a house brand. This is not asking McDonald's, you need to stop using the term Filet-O-Fish. You can offer another product with a different name, but still under the McDonald's banner, and everyone will know the source where this product comes from. This is akin to asking McDonald's to stop using McDonald's. Our entire goodwill, our entire business has been vested in this name. I believe it's the only mark that we own. We are now known, for example, as the leading JT8D aftermarket engine provider in the world. These are things that have happened as a result of this investment. We think that this definitely meets our standard for prejudice, and to the contrary, the plaintiff has not established any disputed facts that we believe would raise a material issue on that point. But again, if it was a jury question as to whether or not the delay was unreasonable, the prejudice question would also be a jury question, would it not? I believe, well, I believe like many things, there are many things that are questions of fact, and I would agree that some of these may be questions of fact, but in the absence on the record of disputed material facts, it is still a matter that the district court may decide on its own. Let me ask you this. What if we disagree with the district court on one or two of its factual findings, on one or more of the factors under e-Systems, and then we think that the facts taken in favor of the plaintiff, as I think we must at this point, would change the weighting of that factor, but we nonetheless conclude that if the district judge had understood the facts as we now see them, it would not have been an abuse of discretion for the district judge to grant summary judgment. Is that enough? The reason I ask that question is I'm troubled. I'm not sure it is enough, because at that point, the district judge on these new facts might or might not have decided in the way he did. We're not being asked then to decide, did he abuse of discretion based on an appropriate decision, or asked to imagine what he would have decided. Does that mean we have to remand for another exercise of his discretion if we start changing around what the underlying factual assumptions are? I don't think so, and here's why. Because the standard of review that was stated in BD states that we review the disputed facts a de novo. That seems to me anyway to take into account that there may be certain factual disputes that this court would decide differently. But notwithstanding that, it still applies the standard of review for abuse of discretion with respect to the latches, the application of latches to those facts, and I'm assuming those facts are the facts as the appellate court sees them. It's been a while since I've read BD, but my recollection is that that specific question wasn't presented or answered in that case. Okay. You would know better than I would, but that's my read of the case. But then I go back. If there are disputed issues, and I guess you claim they're not material facts, summary judgment was improper. If there are disputed issues of material fact? Fact, right. I believe if there are disputed issues of material fact for a sufficient number of these factors, then summary judgment would be improper. This is a balancing test, and like any balancing test, all of these factors need not favor one party for it to prevail. And just at the district court, and this would be the case here, if a certain number of these factors were determined not to have disputed issues of material fact, such as perhaps the strength of the plaintiff's trademark rights or its diligence in enforcing its mark, then I believe that even though there may be one or two factors that might have disputed issues of material fact, the court could still determine as a matter of law that that would not affect its analysis. And do you claim, I ask this question of opposing counsel, that under California law the six factors test applies? I do not know the exact answer to that question. I am familiar with a fair wealth of authority that states in looking at cases where there's a federal trademark infringement claim and then a claim for infringement under California state law, the court tends to treat both claims equally, just as it tends to equate a 17200 claim under the Business and Professions Code with a claim under the Lanham Act. But if the court has any desire, we'd be more than happy to submit a post-hearing brief on that point. Is a latch as a trial a jury issue or is that even where damages are concerned, is that a jury issue or is that a judge issue? Well, as this Court stated in Beattie, one of the important principles, and we can glean this from the standard of review, is that we afford a district court a wide amount of discretion in determining whether to apply latches or not. And so based on that, I think whether to apply latches can definitely be a district court decision. There are cases where a jury, I'm sure, could effectively mitigate or cut down on the amount of damages because of what it might perceive as an unreasonable delay. There certainly might be statute of limitations issues with respect to trying to recover under the Lanham Act past a certain period of time. But if I understood your question correctly, I believe the application of the doctrine itself is an issue for the district court. Thank you. I realize we're taking you over time, and this is prompted by Judge Alsop's question, and this may be precisely the same question. When he asked you whether or not it was a jury question or a question for the district court, and I simply, this question occurs to me as Judge Alsop asked the question, is it a jury matter in the sense of a legal question or is it a non-jury question in the sense of being an equity question? And that is to say the doctrine of latches is an equitable doctrine, and is it therefore always for the district judge to do whether or not we're deciding disputed questions of fact? I mean, there must be some law out there. I just don't know what it is. I think you're exactly on point. It is an equitable doctrine, and therefore it's something that's in the hands of the district court judge. While this court would review whether that doctrine was applied correctly or within a certain standard of review, again, if I understand the question, I do believe that's a determination for the district court judge. So even if there are, in the end, disputed questions of material fact, it's not going to the jury. It's only going to the judge because it's an equitable doctrine? I believe so, yes. Are there cases that so hold? I do not know. Again, more than willing to submit a post-hearing brief if the court requests. If we want, we will separately require or request such briefs. Unless you hear from us, don't worry about it. Okay. Thank you very much. Okay. Thank you, Your Honor. I believe you saved a little time. Thank you, Your Honor. On that last question about whether if this case is reversed and remanded, would the district court address, would it be in the district court's hands to apply the laches test, or would it be in the jury's hands? The answer is it would be in the jury's hands. There's a case. I don't have the name, but I have the site. It's 263F3rd942 at page 962, Ninth Circuit, 2001. That case held, if you can bifurcate the laches issue from the substantive claim, then the judge gets laches and the jury gets the underlying claim. You couldn't bifurcate the laches from this claim. There are too many issues in common. You've got likelihood of consumer confusion. You've got strength of the trademarks involved, et cetera. I see. So it's not that it is necessarily a jury question, but it's a bison or dairy queen question. Okay, I understand. I just missed the last couple words you said, Your Honor. There's an early doctrine out of the Supreme Court that when you have overlapping claims that go to the jury and claims that go to the judge because they're equity, the jury gets to decide all questions of fact that are held in common between the damages, and that sounds like an application of that principle. That's correct, Your Honor. That's right, and if I could just make one other point. If there is one genuine issue of material fact in dispute, this case must be reversed and remanded. There's no you can't say, well, it's a minor material fact, therefore, reversal is inappropriate. It doesn't work that way. For example, if the court finds that our version of the fact is possible, if our version of the facts is possible that we should have discovered the defendant no sooner than we actually discovered the defendant, which is in March 2000, then there's absolutely no delay. Maybe there's two months of delay between discovery and the cease and desist letter. Well, that's enough to send the entire case to a jury on a laches trial. I wonder about that, and I couldn't find any case law on this point, but maybe you know one. What do you do in a case where it's a discretionary standard and many factors for the district judge to apply? Just hypothetically, let's say there are ten factors to apply. Here there are six. And let's say the district judge was absolutely sound on every single factor, but there's one where there was a question. And let's say that all factors in the district court's eyes went in favor of the appellee. So the appellant comes up and says, wait a minute. I can show you that the judge made a mistake on factor number ten. Therefore, that's enough to go back and do it all over again. But let me finish. Now, looking at this, we say it's absolutely clear that the district judge would have reached the same result, even if it had been a nine-to-one balancing. So is there case law? I know what your argument is going to be. Your argument is going to be you've always got to send it back and do it again. But has the Ninth Circuit ever said that before in a reported decision? I looked hard for that. I couldn't find it. I would like to know what your answer on that. Do you have a case on point is what I'm asking. The closest case I would have is the Beattie case. Okay. Remind me what that says on this point. It says if there's a dispute of fact, the district court's resolution of disputes of fact is reviewed de novo. The district court's application of the equitable latches doctrine is reviewed for abuse of discretion. But I think it's a fair statement to say it doesn't specifically address that point. If there is a dispute of fact, what does the appellate court do when it's got those two different scenarios? Because from what you've said, sure, it would be de novo is the factor number 10. The appellate court says the district judge was wrong about that. There was a fact issue. But now what do we do about the abuse of discretion part on the other nine factors? The point I would make is if it's a material fact, then essentially the court's hand is directed. If it's material, you've got to reverse. Well, there's a circularity there because material is presupposing that it makes a difference to the outcome. How do we know if nine out of 10 is enough versus six out of 10 or, in this case, five out of six or four out of six? When there are six prongs and maybe some of the prongs are more important than others, the one that the example I stated just a minute ago, if under our version of the facts there was no delay whatsoever, I would argue that's a material fact. Prong number six, under our version of the facts, plaintiff was not harmed at all because he was ‑‑ defendant was not harmed at all because defendant did not reasonably rely on Mr. Clayton's conduct in his discussion after the cease and desist letter. If defendant's not harmed at all, we'd argue that's a material fact and the case must be reversed for trial. So we would say that this is not one of the extremely rare cases where summary judgment elections was appropriate. This is a typical case where there are many disputes of material fact and reversal is appropriate for trial. Okay. Thank you. Thank you very much. We thank both of you for your helpful arguments. The case of Aeroturbine Inc. versus Aeroturbine Inc. is now submitted, and we will be in recess until tomorrow morning. All rise. This court for this session extends adjournment. I don't get it. In other words, if you read into somebody's mind, as a matter of law, that an appropriate agreement back then nullified stock option sign mutton time. I think the term is not ambiguous. It's ambiguous about being option agreements. That came later, though. But both the employment agreement and the termination agreement would be appropriate. And the termination agreement only referenced it as to one of the trials. Well, I take it. Let me find a line of questioning. The agreement speaks about appropriate stock option. And I gather you're not exactly sure what the agreement is. Nearly there. Correct. Now, the appropriate agreement, but we don't know what it is at the time of the original agreement. Do we know what it is at the time of the agreement? Do we know what it is at the time of the agreement? The agreement was ready and agreed upon stock. That, in a sense, is an appropriate, spelled out. At the time, one is subject to a non-correlation stock option agreement. What that agreement is, an appropriate agreement. We don't quite know what. Is that right? Paragraph four of both non-qualified... ...as requiring to register... Yes, okay. ...and later. Correct. And at what time... ...two months before signing the agreement terminating the table. This agreement... Well, it's referred...
judges: Dw Nelson, W. Fletcher, Alsup